Argued and submitted April 28, order modified September 15, 1982

In the Matter of the Compensation of
David Fraijo, Claimant.

FRAIJO,
*Petitioner,*

*v.*

FRED N. BAY NEWS COMPANY,
*Respondent.*

(No. 80-06516, CA A22873)

650 P2d 1019

Peter W. McSwain, Eugene, argued the cause for petitioner. On the briefs were Steven C. Yates and Malagon, Velure & Yates, Eugene.

Katherine H. O'Neil, Portland, argued the cause for respondent. On the brief was Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

The issue in this workers' compensation case is the extent of permanent partial disability sustained by claimant as a result of a compensable industrial injury to his neck on June 16, 1975. In a series of three determination orders, claimant was awarded 20 percent of the maximum allowable permanent partial disability, in addition to temporary total disability. The referee increased claimant's permanent partial disability award to 50 percent. The Workers' Compensation Board (Board) lowered the referee's award to 30 percent. Claimant appeals, arguing that the rules adopted by the Board to determine the extent of unscheduled, permanent partial disability transform unscheduled injuries into scheduled ones, violate due process and eliminate *de novo* review in extent of disability cases. He argues further that, even if the rules are valid, the Board misapplied them to the facts of this case and that he is entitled to at least 50 percent permanent partial disability. We modify the award.

Claimant suffered an injury to his neck in June, 1975, while employed by Fred N. Bay News Company (hereinafter "employer"). Dr. Torres, diagnosed dorsal back strain and ordered claimant off work. Claimant subsequently was examined by several doctors, at least two of whom suggested that he not return to the same occupation and that he limit his lifting to 40 or 50 pounds. Psychiatric examination indicated that claimant performed intellectually at a low-average to dull normal range with non-verbal materials and at a dull normal to borderline range with verbal materials. Dr. Munsey, the psychologist, indicated that he was quite focused on his physical symptoms, some of which were likely psychological in origin.

Claimant was referred to Dr. Hill, who in turn referred him to Orthopedic Consultants. The doctors there diagnosed chronic cervical ligamentous and muscular strain. They also recommended that claimant limit his lifting to 40 pounds. They concluded that total loss of function of the neck was mild, that loss of function due to the 1975 injury was minimal and that the difference was due to an earlier injury which claimant had sustained in 1972. They felt that claimant's condition was stationary.

In September, 1977, Dr. Hill reported that claimant's problem had become that of chronic pain syndrome and referred claimant to the Northwest Pain Clinic. There, Dr. Seres concluded that claimant's disability was not severe and that he could return to moderate work activity if he chose to do so. Dr. Hill reported that claimant's condition was medically stationary on March 30, 1978.

In May, 1978, claimant came under the care of Dr. Danielson, a neurosurgeon, who recommended surgery, and Dr. Anthony Gallo, also a neurosurgeon, who Health Sciences Center concurred with that recommendation. Claimant underwent surgery for anterior cervical disc excision and intercorporal fusion, anterior bilateral foraminotomies and excision of the posterior osseous plate.

Claimant continued to experience pain in his shoulder and neck area following surgery. On June 10, 1980, Dr. Danielson reported that claimant was medically stationary and that his total loss of function was moderate. He stated that claimant was unable to do his prior work-related activities and that his disability was permanent. He did feel, however, that claimant was capable of doing work in the performing music field, a field claimant had entered, because he could sit and stand and would not be required to do heavy lifting or other deterimental activities while performing. Dr. Danielson subsequently reported that claimant was not capable of work activities requiring frequent bending, stooping, squatting, overhead activities, heavy lifting or pushing type maneuvers.

On August 18, 1980, claimant was examined by Dr. Smith, a neurosurgeon, at the request of the carrier. He reported that his examination suggested no specific findings that could be directly correlated with continuing disability referred to the neck or the subsequent surgical procedure. He recommended two or three weeks of physical therapy, after which he believed that claimant could be considered stationary and released to return to any type of occupation he desired. Smith did not believe that claimant had a physical impairment that he would rate beyond the minimal to mild level and concluded that claimant could return to "any occupation [for which] he feels suited." Claimant was also examined by Orthopedic Consultants on September 23,

1980, at the request of the carrier. The doctors there said that claimant's condition was stationary and that he should be able to do light work. They concluded that his loss of function due to his 1975 injury to the cervical spine was mild.

The referee accurately summarized claimant's current employment options and his employment history as follows:

"In approximately August, 1980, claimant became employed as lead guitarist with the Crystal Sage Band, a six-member country and western group which plays regularly at Charlie Chin's Restaurant. The band initially played six nights a week and claimant earned $250.00 per week, but for the past month they have been cut to five nights a week and he earns $215.00 per week. Each night, claimant plays five forty-five-minute sets with a fifteen minute break between each set. He has a stool available when he is playing and can sit or stand as he chooses.

"Claimant is 39 years of age and has a ninth grade education. He has worked making screen doors, doing body and fender work and driving truck. During this time, he also played guitar occasionally. He has had prior injuries to his neck before his 1975 injury, beginning with an injury in 1972 and all incurred while working for the same employer as when he was injured in 1975. His current complaint is of pain in his neck with strenuous activity, especially with heavy lifting or using his arms overhead. He complains of a knot in his upper back which occurs when he performs these activities. The pain causes him to refrain from these activities or to cease doing them when he tries. He is able to drive a tractor and rake for short periods and he has split, cut and brought in some wood. Before his injury, claimant rode horses. He tried to ride since his surgery but it caused him pain. Following his surgery, claimant attempted to work tending race horses owned by his son. He worked for three hours a day for a month or two brushing and walking horses but had to leave this job because of the pain which it caused."

The extent of unscheduled, permanent partial disability is determined on the basis of permanent loss of earning capacity. ORS 656.214(5) states:

"(5) In all cases of injury resulting in permanent partial disability, other than those described in subsections (2) to (4) of this section [*i.e.,* scheduled injuries] the criteria

[sic] for rating of disability shall be the permanent loss of earning capacity due to the compensable injury. Earning capacity is the ability to obtain and hold gainful employment in the broad field of general occupations, taking into consideration such factors as age, education, training, skills and work experience. The number of degrees of disability shall be a maximum of 320 degrees determined by the extent of the disability compared to the worker before such injury and without such disability. For the purpose of this subsection, the value of each degree of disability is $100."

The Workers' Compensation Department, in turn, has promulgated rules to determine the extent of permanent loss of earning capacity in unscheduled injury cases. OAR 436-65-600 provides:

"605-600 GUIDELINES FOR THE RATING OF UNSCHEDULED PERMANENT DISABILITY

"(1) Sections 65-600 through 65-675 apply to the rating of unscheduled permanent partial disability under the Workers' Compensation Law.

"(2) The criteria [sic] for rating of disability shall be the permanent loss of earning capacity due to the compensable injury. Earning capacity is the ability to obtain and hold gainful employment in the broad range of general occupations.

"(a) Impairment of the whole person. This is the basic factor in the evaluation of lost earning capacity. The phrase, 'the whole person,' refers to the average functional capacity normally present in an uninjured worker. Injury-related impairment of the whole person must be documented in the medical record.

"(b) Social/vocational considerations. These are additional factors to be included in the evaluation of lost earning capacity. Depending on the circumstances of the individual worker, they may include: age, education, work experience, adaptability to less strenuous physical labor, mental capacity, emotional and psychological findings and findings in the labor market. For each social or vocational factor a range of expected impact on disability is given. The range begins at zero impact. Those findings which tend to reduce the disabling effects of the injury are given negative (−) values. Those findings which tend to increase the disabling effects of the injury are given positive (+) values."

OAR 436-65-601 provides:

"65-601 ASSEMBLING THE FACTORS RELATING TO LOSS OF EARNING CAPACITY

"(1) Determine the basic value which represents the impairment of the whole person, according to the appropriate findings and classifications described in Sections 65-609 through 65-675 below. If impairment is present, this will always be a positive (+) value.

"(2) Identify the appropriate social/vocational factors applicable to the injured worker, according to the relevant findings described in Sections 65-602 through 65-608 below. Depending on their impact on the worker's disability, these may be determined to reprsent either positive (+), negative (−), or zero values.

"(3) In two separate calculations,

"(a) combine together the positive (+) values found in (1) and (2) above, and then

"(b) combine together the negative (−) values found in (2) above.

"(4) The final negative (−) combination value is then taken as a percentage of the final positive (+) result, when rounded to the nearest five percent, represents the percentage of lost earning capacity to be compensated."

OAR 436-65-602 to 436-65-608 contain criteria for assigning scores in each of the categories listed above—age, education, work experience, adaptability to less strenuous physical labor, mental capacity, emotional and psychological findings and labor market findings.

■ In his first assignment of error, claimant argues that the quoted rules turn unscheduled disabilities into scheduled ones. His third assignment of error claims that the rules eliminate *de novo* review in extent cases. Together, the two assignments constitute an attack on the legality of OAR 436-65-600 *et seq.* We considered a challenge to the legality of these same rules in *OSEA v. Workers' Compensation Dept.,* 51 Or App 55, 624 P2d 1078, *rev den* 291 Or 9 (1981). There the petitioner argued "that the plus and minus system of calculation established by OAR 436-65-601 is a formulaic chart and graph method which is not found in existing law." We stated:

"Petitioners' contention here seems to be that such an evaluation system with this weighing of factors is not

found in existing law. Again our response is that the director is authorized to do more than compile existing law. *Petitioners contend that it is inflexible and prevents personal evaluation of each individual.* We cannot say that the system of evaluation is invalid on its face. *If the rules are applied in such a manner as to be inconsistent with the statutory or case law regarding permanent unscheduled disability they may be challenged on that basis at the time."* (Emphasis supplied.) 51 Or App 64-65.

Claimant argues that "[t]he court never addressed the issue of unscheduled injuries in *OSEA v. Workers' Compensation Dept., supra."* That is obviously incorrect. As the above quotation illustrates, we expressly upheld the facial legality of the rules concerning unscheduled injuries. Although we acknowledged the possibility that the rules could be applied in such a manner as to be inconsistent with the law, we declined to find them unlawful in the abstract. Claimant's attack here resembles that in *OSEA.* It is for the most part hypothetical, *i.e.,* it does not show how the rules, *as applied to claimant,* were inconsistent with the law. To the extent it is hypothetical, claimant's argument is therefore resolved by *OSEA v. Workers' Compensation Dept., supra.* To the extent that the rules are being attacked *as applied,* we deal with that problem in our *de novo* evaluation of the extent of claimant's disability, *infra.*

In his second assignment of error, claimant argues that the rules violate "due process." The argument is not supported by constitutional authority and appears merely to repeat arguments already considered. We therefore reject it.

■  Claimant argues next that the Board misapplied the rules in this case. He points out that the Board's order misstated his age and that it incorrectly characterized his intelligence level as "low average" when, in fact, it is "dull normal." The employer acknowledges that the Board erred in stating claimant's age as 30 instead of 39, but does not address the alleged error in characterizing claimant's intelligence level. Psychological tests indicated that claimant's intelligence level was "dull normal to borderline" verbally and "low average to dull normal with non-verbal materials." Claimant is therefore correct in that the Board should have characterized his intelligence level as "dull

normal" rather than "low average."[1] A correct calculation based on claimant's correct age and intelligence level results in a 40 percent loss of earning capacity rather than the 30 percent loss found by the Board.[2]

■       In his final assignment of error, claimant argues that the extent of his permanent loss of earning capacity is at least 50 percent. We have conducted our own *de novo* review, utilizing the Department's rules merely as a tool. In this and future extent of permanent partial disability cases, and in view of our *de novo* review responsibilities, we

---

[1] OAR 436-65-606, which assigns values to mental capacity, does not contain the "low average" category used by the Board. The Board gave claimant a value of zero in this category, which is appropriate for a person of average mental capacity.

[2] The Board calculated as follows:

"Consideration of the rating standards in OAR 436-65-600, et seq, produces the follows:

| "Impairment | +10 | |
|---|---|---|
| "Age | | −5 |
| "Education | + 8 | |
| "Work Experience | -0- | |
| "Adaptability | + 5 | |
| "Mental Capacity | -0- | |
| "Emotional & | | |
| Psychological | | −5 |
| "Labor Market | +15 | |
| | +33 | −10 |

"Multiplying positive by negative produces 3.30. Subtract this result from the positive total to produce 29.70, or 30%"

The Board should have assigned a score of 0 for claimant's age. *See* OAR 436-65-602(2). Claimant should have received a +5 score for his "dull normal" mental capacity. The resultant calculation should have been:

| Impairment | +10 | |
|---|---|---|
| Age | -0- | |
| Education | + 8 | |
| Work Experience | -0- | |
| Adaptability | + 5 | |
| Mental Capacity | + 5 | |
| Emotional & | | |
| Psychological | | −5 |
| Labor Market | +15 | |
| | +43 | −5 |

Multiplying positive by negative produces 2.15. Subtracting this result from the positive total of +43 produces 40.85 or 40 percent. (We do not claim to understand the mathmatics of the scoring system.)

shall use the Department's "green book" rules only when the record discloses the manner in which the Board used them, and then only to the extent their intrinsic persuasiveness assists us in performing our independent assessment function. We *assume* the Board is doing what we are doing—using the rules as guidelines only.[3]

After reviewing the record, we conclude that the 40 percent figure which happens to be the figure reached by a correct application of the Department's rules is also a fair assessment of the extent of claimant's disability. Accordingly, claimant's award is modified to 128 degrees for 40 percent permanent partial disability.

Order modified to award 128 degrees for 40 percent permanent partial disability.

---

[3] A review of the Board's order leaves doubt as to just how the Board is using the rules. At one point, it appears to be following them lockstep, without consideration of the individual. At another point, however, it explains its reduction of the referee's award, not in terms of the rules but rather on a traditional basis: "Based on the record before us[,] we find the Referee's award is excessive and not comparable to other cases in which 50 percent unscheduled disability awards have been granted." On the assumption that the latter approach is being used, there is nothing that the Board is doing which arguably requires correction.